## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Bridie Anne Wickstrom and
Jason Elmer Wickstrom,

Civil No. 18-2521 (DWF/LIB)

Plaintiffs,

v.

**MEMORANDUM
OPINION AND ORDER**

City of Moose Lake; Carlton
County; Pine County; Bridget Karp,
acting in her individual capacity as
an employee of the Carlton County
Sheriff's Office; Randy Roberts,
acting in his individual capacity as
an employee of the Carlton County
Sheriff's Office; John and Jane Does
acting in their individual capacities
as supervisors, officers, deputies,
staff, investigators, employees or
agents of the Entity Defendants,

Defendants.

---

Jonathan A. Strauss, Esq., Lorenz F. Fett, Jr., Esq., Sonia L. Miller-Van Oort, Esq., Sapientia Law Group PLLC; counsel for Plaintiff.

Jon K. Iverson, Esq., Stephanie A. Angolkar, Esq., Susan M. Tindal, Esq.; Iverson Reuvers Condon; counsel for Defendant City of Moose Lake.

Joseph E. Flynn, Esq., Sharon Albrecht, Esq., Tal A. Bakke, Esq., Jardine, Logan & O'Brien, PLLP; counsel for Defendants Carlton County, Pine County, Bridget Karp, and Randy Roberts.

**INTRODUCTION**

This matter is before the Court on Motions for Judgment on the Pleadings by

Defendants City of Moose Lake ("Moose Lake"), Carlton County, Pine County (the

"Counties"), Bridget Karp ("Karp"), Randy Roberts ("Roberts"), John and Jane Does

("Does") (collectively, "Individual Defendants") (altogether, "Defendants"). (Doc. Nos.

30, 41.) For the reasons set forth below, the Court grants Defendants' motions.

**BACKGROUND**

**I.    General Background and Procedural History**

Plaintiffs Bridie Anne Wickstrom ("Bridie") and Jason Elmer Wickstrom

("Jason") (collectively, "Plaintiffs") are Minnesota residents who have lived in both Pine

County, Minnesota, and Carlton County, Minnesota during the four years prior to the

filing of their complaint. (Doc. No. 7 ("Am. Compl.") ¶¶ 20-21, 132.) Bridie is

employed at Grand Casino Hinckley, where she has worked for approximately 23 years.[1]

(*Id.* ¶ 42.) Jason is a pipeline inspector and works in the areas of Milaca, Minnesota, and

Superior, Wisconsin.[2] (*Id.* ¶ 43.)

Moose Lake is located in Carlton County, and in turn, both Counties are located in

Minnesota. (*Id.* ¶¶ 22-24, 130.) The Counties share a border.[3] (*Id.* ¶ 131.) Defendants

---

[1]      The casino is in the city of Hinckley, which is in Pine County, Minnesota.

[2]      Milaca is in Mille Lacs County, west of Pine County and southwest of Carlton County. Superior is in Douglas County, Wisconsin, which is northeast of Pine and Carlton Counties and borders Minnesota.

[3]      Carlton County is immediately north of Pine County.

Karp and Roberts are Minnesota residents and employed by Carlton County as law enforcement officers, and it is Plaintiffs' belief that John and Jane Does are Minnesota residents and employed by Moose Lake and the Counties as law enforcement officers. (*Id.* ¶¶ 2, 26-28.)

The Minnesota Department of Public Safety ("DPS") maintains a Driver and Vehicle Services database of records for drivers licensed and vehicles registered in the state ("DVS Database"). (*Id.* ¶¶ 2, 30.) Following findings of pervasive misuse of the DVS Database, in 2014 DPS terminated law enforcement officers' access to the DVS Database in favor of access to the Minnesota Bureau of Criminal Apprehension's ("BCA") database ("MyBCA") which also provides access to the DVS driver and vehicle data, but DPS allowed other individuals and entities it had previously granted access to keep their access to the DVS Database. (*Id.* ¶¶ 2, 36-37, 39.) Moose Lake and the Counties provide their law enforcement personnel with access to state databases containing driver's license and vehicle registration information of Minnesota drivers for use in carrying out their duties. (*Id.* ¶ 2.) Both the DVS Database and MyBCA allow individual records to be accessed through queries by name, driver's license number, or license plate number. (*Id.* ¶ 32.)

Plaintiffs began dating in March 2014, began living together around June 2014, and were married September 30, 2017. (Am. Compl. ¶ 44.) Plaintiffs started their romantic relationship while each was in the process of divorcing, with Jason's divorce from Rhonda Wickstrom ("Rhonda") being "particularly acrimonious." (*Id.* ¶ 45.) Jason obtained an Order for Protection against Rhonda in Carlton County ("OFP") in December

2014. (*Id.* ¶ 46.) Before the OFP was issued, the Carlton County Sheriff's Officer was called to respond to disputes between Plaintiffs and Rhonda on "several occasions." (*Id.* ¶ 47.) In 2015 and 2016, after the OFP was issued, Plaintiffs called the Carlton County Sheriff's Office to report possible violations "at least" twice. (*Id.*)

Plaintiffs contend that starting in 2014, they were "frequently" being stopped by law enforcement when driving, "seemingly for no reason." (*Id.* ¶ 48.) Although the officers would say they were being stopped for having a light out, when Plaintiffs checked their lights they found them to be functioning properly. (*Id.*) Plaintiffs went to the Carlton County's Sheriff's Office on or about September 5, 2014, where they spoke with Sergeant Brian Belich ("Sgt. Belich") about the frequent stops. (*Id.* ¶ 49.) Sgt. Belich told Plaintiffs he "would call the BCA to check whether their information was being looked up."[4] (*Id.* ¶ 7.) Sometime later, Sgt. Belich called Plaintiffs and told them "no one had looked them up," "nothing unusual was going on," and that they "should 'just drop it.'" (*Id.*)

Around December of that year, Bridie contacted the BCA herself and was told by Judy Strobel, Business Shared Services Manager, that "no one from Carlton County had ever called to obtain information regarding lookups of [Plaintiffs'] information."

---

[4] Moose Lake and the Counties could request audits from DPS of employees' accesses to state databases. (Am. Compl. ¶¶ 74, 78.) The Court observes that others in supervisory roles have done so to monitor for abuse *(see, e.g., Orduno v. Pietrzak*, 932 F.3d 710, 714 (Police Chief of White Bear Lake, Minnesota obtained an audit from DPS showing accesses of an individual's data that identified the accessors by their login credentials)), but, to the Court's frustration, it has typically been the situation in this district's many DPPA cases that complaints must be allowed to proceed to the discovery phase before individual accessors are identified.

(*Id.* ¶ 9.)  Bridie also spoke with Gary Link, BCA Director of Training and Auditing, who told her that "he had never seen so many lookups."  (*Id.*)

Plaintiffs allege that, through the employee access provided by Moose Lake and the Counties, Individual Defendants obtained Plaintiffs' private data without a legitimate law enforcement purpose and for personal reasons, thereby violating the Driver's Privacy Protection Act, 18 U.S.C. § 2721, *et. seq.* ("DPPA").  (*Id.* ¶¶ 1, 92-99.)  Plaintiffs allege that Bridie's information was impermissibly accessed at least 28 times and Jason's at least 10 times within the statute of limitations period for this claim, and that these impermissible accesses were made using Plaintiffs' names, driver's license numbers, or license plate numbers.  (*Id.* ¶¶ 3-6, 100.)

Plaintiffs base their allegations on their personal relationships with several members of law enforcement.  Sometime in the interim between their communications with Sgt. Belich and their communications with the BCA, Karp, who is "good friends" with Jason's ex-wife Rhonda, called Jason to tell him that "Rhonda had asked [Karp] to do different things for [Rhonda]" and to apologize for "getting mixed up with Rhonda," ending the call without giving details.  (*Id.* ¶¶ 50, 53.)  Plaintiffs believe Rhonda "also has a personal relationship" with Roberts, and "used her connections" to law enforcement "to harass Plaintiffs and gain advantage over them in the divorce" by having Karp look up their information "as a way of investigating Plaintiffs' assets."  (*Id.* ¶¶ 54, 55.)  Plaintiffs also believe Individual Defendants were motivated to access Plaintiffs' information by curiosity about "a messy divorce that was a subject of gossip in their small community."  (*Id.* ¶ 61.)  Plaintiffs point to additional connections to law

enforcement personnel, noting that Bridie has been acquainted with the Moose Lake

Police Chief Bryce Bogenholm since their high school days, when he and her boyfriend

played football together.[5]  (*Id.* ¶ 60.)  Jason is connected to the police chief too, through

Bogenholm's wife, a person Jason has known since grade school who is "best friends"

with Jason's estranged sister.  (*Id.* ¶¶ 56-59.)

## II.    Accesses

Plaintiffs requested audits from DPS of accesses to their information.  (*Id.* ¶ 4.)

Plaintiffs attached as exhibits to their complaint summaries of obtainments of Plaintiffs'

driver's license records gleaned from audits furnished by the DPS.  (Doc. No. 7-1, Ex. A

("Bridie Sum."), Ex. B ("Jason Sum.").)  The accesses listed in these summaries total 78

accesses of Bridie's data and 28 accesses of Jason's data originating from Moose Lake

and the Counties.[6]  (Bridie Sum., Jason Sum.)  The accesses within the statute of

limitations period total 27 and 10, respectively.  (*Id.*)  Plaintiffs aver that their data was

accessed "hundreds of times by employees of various law-enforcement agencies."

(Doc. No. 36 at 4.)  It is not clear if Plaintiffs know what type of query was used—name,

driver's license number, or vehicle plate number—because this information is not

---

[5]     Chief Bogenholm has been in his position since 2010.  (Am. Compl. ¶ 133.)

[6]     The Eighth Circuit has clarified that "sequential accesses occurring within a
several-minute time span should be considered as one obtainment rather than several."
*Tichich v. City of Bloomington*, 835 F.3d 856, 867 (8th Cir. 2016).  This total reflects a
calculation erring to the benefit of Plaintiffs, with some accesses that occurred
simultaneously or very close in time nonetheless counted separately because they are
attributed to different devices.

included in the summaries, but Plaintiffs contend that "it matters not" since it is a violation of DPPA to access data for any impermissible purpose.[7]  (*Id.* at 12, n. 7.) Plaintiffs offer these summaries in order to "simplify the case for this Court."  (Doc. No. 53 at 15, n. 6.)  Additionally, Plaintiffs state that accesses related to calls to the Carlton County Sheriff about possible OFP violations by Rhonda "are not at issue in this case."[8]  (Doc. No. 36 ¶ 47.)  As Plaintiffs' counsel explains it, the exhibits list only accesses that Plaintiffs' "consider . . . as having been made for an improper purpose." (Doc. No. 37 ("Strauss Aff.") ¶ 3.)  Plaintiffs excluded accesses that were, in their judgment, made for legitimate law enforcement or governmental purposes.  (Doc. No. 36 at 4.)  Plaintiffs do not know whose login credentials were used to make each access, but individual accessors can be identified through discovery.  (Am. Compl. ¶¶ 124-25.)  The summaries list the entity, device, date, and start time for the obtainments, but some entries do not include a device.[9]  (Bridie Sum., Jason Sum.)

---

[7]     One of Plaintiffs' counsel states that with previous DPPA cases, DPS provided "more easily readable and informative" audits that those provided in this case (Strauss Aff. ¶ 4), but Plaintiffs seem to concede that "some of the law-enforcement personnel obtained Plaintiffs' drivers' license information by accessing Plaintiffs' license plates instead of their names" (Doc. No. 36 at 12, n. 7).

[8]     Plaintiffs are apparently aware of the exact dates of calls to the Carlton County Sheriff's Office regarding suspected OFP violations and assert that they excluded accesses on those dates from their summaries, but do not offer the dates of their contact with law enforcement.  (Am. Compl. ¶¶ 136-37.)

[9]     Plaintiffs do not explain the significance of the device category or why that information is not included for every access listed.

## A.     Moose Lake

According to Plaintiffs' summaries, users from Moose Lake accessed Bridie's data seven times between January 13, 2012 and November 21, 2017.  (Bridie Sum.)  Six of these accesses occurred within the statute of limitations period.  (*Id.*)  The first access took place on October 12, 2013 at 1:52 a.m.; the next was over 15 months later on January 30, 2015 at 11:00 a.m.  (*Id.*)  This access was followed by an early-afternoon check of her records on July 1, 2015, another access on New Year's Day of 2016 at 3:13 p.m., then an access on April 5, 2016 at 5:30 a.m. that happened within one minute of an access by someone from Carlton County.  (*Id.*)  The last access by Moose Lake of Bridie's data occurred on February 18, 2017 at 10:18 p.m. (*Id.*)  Moose Lake accesses are attributed to four different devices, but two of the seven accesses do not specify a device. (*Id.*)

Users from Moose Lake accessed Jason's data five times between February 28, 2012 and March 8, 2018; three of the accesses were within the statute of limitations period.  (Jason Sum.)  The first access was New Year's Eve of 2012 at 11:40 p.m.  (*Id.*)  Jason's data was next accessed approximately 15 months later on April 27, 2014 at 4:27 p.m.  (*Id.*)  After that, Moose Lake users accessed Jason's data on February 23, 2015 at 3:56 p.m., July 3, 2015 at 3:34 in the morning, and on New Year's Day of 2016 at 2:59 p.m.  (*Id.*)  The last access happened around roughly the same time that the same device from Moose Lake accessed Bridie's data, and within four minutes of an access of Jason's data by someone from Carlton County.  (Bridie Sum., Jason Sum.)  Two separate Moose Lake devices accessed Jason's information.  (Jason Sum.)

### B. Carlton County

Users from Carlton County accessed Bridie's data six times between January 13, 2012 and November 21, 2017. (Bridie Sum.) Five of these accesses were within the statute of limitations period. (*Id.*) The first obtainment was on May 28, 2012 at 1:04 p.m., followed by an early-morning access over two years later on September 5, 2014 at 3:51 a.m. (*Id.*) The next access by Carlton County took place on March 29, 2015 at 1:11 a.m. (*Id.*) Several months later, on August 5, 2015, Bridie's data was accessed at 5:45 p.m., then another several months passed before the next access on April 5, 2016 at 5:31 p.m. at almost the exact same time someone from Moose Lake accessed Bridie's data. (*Id.*) The last access listed was on March 30, 2017 at 10:52 a.m. (*Id.*) Plaintiffs' summary does not list a device for two of the accesses, but for the remaining four, four separate devices are listed. (*Id.*)

Carlton County users are responsible for the bulk of all accesses of Jason's data as summarized. (Jason Sum.) Jason's data was obtained between 14 and 16 times outside the statute of limitations and six times within the statute of limitations period, depending on whether certain accesses are counted together.[10] (*Id.*) The Carlton County accesses start on February 28, 2012, and end on March 8, 2018. (*Id.*) Accesses are credited to thirteen different devices, and for five accesses, no device is listed. (*Id.*) The latest

---

[10]     Although it need not decide the issue, the Court notes that there were two accesses on May 12, 2013 at 11:49 a.m. and 11:50 a.m., which should generally be counted together, but these accesses are attributed to two separate devices. (*Id.*) Again, on February 12, 2014, two accesses occur close in time, with no device listed for either, but as they are 14 minutes apart (at 11:39 a.m. and 11:53 a.m., respectively), they are likely not within a "several-minute time span." (*Id.*)

access was at 11:14 p.m. on August 28, 2014, while the earliest in the morning took place at 4:51 a.m. on July 10, 2014. (*Id.*) These are the only two accesses made using Carlton County login credentials during late-night or early-morning hours. (*Id.*) As noted above, there was one access on New Year's Day of 2016 at almost the exact same time a single device from Moose Lake accessed both Jason and Bridie's data. (*Id.*, Bridie Sum.) Except for accesses which are close enough in time to arguably count as one access, weeks or months passed between each time Jason's data was accessed by Carlton County users. (Jason Sum.) The shortest time between accesses was nine days, between December 21, 2012 and December 30, 2012. (*Id.*) The longest interim was over a year, from January 1, 2016 to March 8, 2017. (*Id.*)

### C.    Pine County

The majority of accesses of Bridie's data were made using Pine County credentials. (Bridie Sum.) Bridie's data was accessed as many as 49 times outside the statute of limitations period, and 17 times since August 28, 2014.[11] (*Id.*) Fifteen separate devices are listed, while for some accesses no device is identified. (*Id.*) Roughly 16 of the accesses took place during late-night or early-morning hours, although none of these fell within the statute of limitations. (*Id.*)

Jason's data was accessed only once by Pine County, on September 5, 2017 at 8:07 a.m. (Jason Sum.) No device is listed. (*Id.*)

---

[11]    Several of these accesses took place close in time but are attributed to different devices or no device is listed; the number of separate obtainments that should be considered separately may be lower.

Plaintiffs commenced this action on August 28, 2018 in a complaint containing one count of violating the DPPA and requesting injunctive relief as well as liquidated, actual, compensatory, and punitive damages and attorneys' fees and costs for alleged injuries suffered when Defendants impermissibly obtained their private data. (Doc. No. 1.) Plaintiffs filed an amended complaint on September 12, 2018. (Am. Compl.) On April 17, 2019, Defendant Moose Lake filed its motion for judgment on the pleadings (Doc. No. 30); the Counties and Individual Defendants likewise filed a motion for judgment on the pleadings on May 30, 2019 (Doc. No. 41).

Plaintiffs claim that they "are not pursuing claims for accesses they believe were related to legitimate traffic stops, calls for service, Orders for Protection, court proceedings, or other legitimate interactions they may have had" with Defendants, and that "[a]t no time did Plaintiffs behave in a manner that would provide any legal justification for Individual Defendants to invade their privacy." (Am. Compl. ¶¶ 137, 139.)

Defendants argue that Plaintiffs have deliberately omitted crucial information and ignored events that would explain Plaintiffs' frequent contact with law enforcement which would have led to legitimate accesses of their information. Moose Lake contends that the "majority" of the accesses in question were made using a vehicle plate number.[12]

---

[12] The Court acknowledges that Defendants are not required to provide audits of more extensive information to which they are privy, however, it reiterates its frustration at the lack of detail available to plaintiffs at this stage in DPPA litigation and observes that a detailed audit could go a long way toward bolstering an "obvious and plausible" alternative explanation for the accesses in question.

(Doc. No. 33 at 9, n.1.)  The Counties, Karp, and Roberts point out that Bridie

successfully petitioned for a harassment restraining order against her best friend's

husband on January 31, 2014 by a Pine County court as a result of an incident on two

days before.  (Doc. No. 43 at 17.)  The Counties, Karp, and Roberts also specify, through

provided documentation, that Jason and Rhonda's divorce proceedings from initial

petition to dissolution spanned approximately one year, from October 15, 2014 to

October 22, 2015.[13]  (*Id.* at 20, n. 4.)

## DISCUSSION

I.     **Legal Standard**

A.     **Judgment on the pleadings**

A party may move for judgment on the pleadings at any point after the close of the

pleadings, so long as it moves early enough to avoid a delay of trial.  Fed. R. Civ. P.

12(c).  "Judgment on the pleadings is appropriate only when there is no dispute as to any

material facts and the moving party is entitled to judgment as a matter of law[.]"  *See*

*Ashley Cty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v.*

*Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)).  The Court evaluates a motion for judgment

on the pleadings under the same standard as a motion brought under Federal Rule of Civil

Procedure 12(b)(6). *See id.*

---

[13]     As requested by the Counties, Karp, and Roberts, pursuant to Fed. R. Evid. 201(b)
and (c), the Court takes judicial notice of the filings they submitted as exhibits.
(Doc. No. 44 ("Flynn Aff."), Ex. 1 ("Harassment Restraining Order"); Ex. 2 ("Divorce
Register of Actions").)

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face*." Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## II.    DPPA

The DPPA prohibits state motor vehicle departments from disclosing personal information about individuals contained in motor vehicle records, including their name, address, or photograph, except for uses enumerated in the statute. *See* 18 U.S.C. §§ 2721(a)-(b), 2725. Use by "any government agency, including any court or law enforcement agency, in carrying out its functions" is listed among the permissible uses

under the DPPA.  18 U.S.C. § 2721(b)(1).  The DPPA provides that "[a] person who

knowingly obtains, discloses or uses personal information, from a motor vehicle record,

for a purpose not permitted" by statute "shall be liable to the individual to whom the

information pertains."  18 U.S.C. § 2724.  The "catch-all" four-year statute of limitations

in 28 U.S.C. § 1658(a) applies in DPPA cases, meaning that the statute of limitations

begins to run when a violation occurs.  *McDonough v. Anoka Cty.*, 799 F.3d 931, 939

(8th Cir. 2015) (*cert. denied*, --- U.S. ---, 136 S.Ct. 2388 (2016) (citing 28 U.S.C.

§1658(a)).  In this case, violations prior to August 28, 2014 are outside the statute of

limitations.

In 2016, the Eighth Circuit summarized and clarified its *McDonough* opinion

which set forth the history, purpose, and applicability of the DPPA as well as the

standards courts should use in analyzing DPPA claims.  *Tichich v. City of Bloomington*,

835 F.3d 856, 866-67 (8th Cir. 2016).  The Eighth Circuit reiterated that "each

defendant's alleged conduct must be assessed independently to insure that [the plaintiff]

had pleaded sufficient facts" to establish each defendant's impermissible purpose.

*Tichich*, 835 F.3d at 866.  Suspicious patterns in access and timing would move some

claims from being merely conceivable to plausible, as required under *Twombly*.  *Id.*

(internal citations omitted).  Allegations should not be assessed in isolation; the

complaint should be read as a whole and time-barred claims can be considered in

assessing the plausibility of timely filed claims.  *Id.*  However, "generalized allegations

merely consistent with the liability of any particular defendant are insufficient to cross

the line of plausibility in the absence of allegations of concerted activity."  *Id.*

14

Evidence of a plaintiff having "a degree of local fame" or a relationship with particular officers or agents of a defendant entity, as well as alleged accesses coinciding with significant events that could explain interest in the plaintiff's personal information, factors into the analysis. *Id.* Suspicious access or timing patterns, such as accesses on the same day or within a short time span through multiple unrelated agencies, or a pattern of accesses late at night when law enforcement personnel may have less supervision and less to do, are also considered. *Id.* Complaints that merit consideration under *Tichich* and *McDonough* involve: "1) accesses on the same day as or within a few hours of accesses by other, unrelated entities during the limitations period; 2) multiple late-night accesses during the limitations period; or 3) a history of frequent suspicious accesses fitting the above criteria, even if prior to the limitations period, coupled with accesses within the limitations period." *Tichich* at 867. Sequential accesses occurring within a several-minute time span should be considered as one obtainment rather than several. *Id.* Courts should also "consider whether there are lawful, obvious alternative explanations for the alleged conduct." *McDonough* at 946 (internal quotation marks and citation omitted).

Courts must assess the plausibility of a plaintiff's grounds for relief using "judicial experience and common sense." *Id.* at 948 (quoting *Iqbal* at 679). Plaintiffs have successfully pled claims of DPPA violations when they have alleged facts that support an inference that the persons who accessed their data were interested in them for a specific reason. *See, e.g., Sapp v. City of Brooklyn Park*, Civ. No. 14-4968, 2015 WL 3795613, at *4 (D. Minn. June 18, 2015) (collecting cases). Examples of facts supporting the

15

inference that violations occurred include searches for a plaintiff by name performed by users from agencies where a plaintiff was not present and with which the plaintiff had no interaction (*Tichich* at 879), an unexplained cluster of multiple accesses from multiple agencies during a 24-hour time period (*Engebretson v. Aitkin Cty.*, Civ. No. 14-1435, 2016 WL 5400362, at *9 (D. Minn. Sept. 26, 2016)), or patterns of hundreds of accesses by users from approximately 180 different agencies looking up, by name, plaintiffs who had regular contact with law enforcement through their work but never as an interested party in a law enforcement matter (*Kampschroer v. Anoka Cty.*, 57 F.Supp.3d 1124, 1134 (D. Minn. 2014), *aff'd*, 840 F.3d 961 (8th Cir. 2016)).

A search by driver's license number, as opposed to a search by name, reasonably implicates a number of legitimate law enforcement concerns, and a high volume of accesses alone is not enough to state a claim. *Mallak v. Aitkin Cty.*, 9 F.Supp. 3d 1046, 1058 (D. Minn. 2014) (internal citations omitted). It is not sufficient, for example, even when a plaintiff alleges evidence of local fame, when there exists a notable quantity of accesses but no pattern emerges. *Berenguer v. Anoka Cty.*, 889 F.3d 477, 483 (8th Cir. 2018) (four accesses by one agency and twelve by another, including some accesses at the same time the records of the plaintiff's children were accessed, over a period of six years insufficient to establish a pattern of suspicious accesses). Even a former police officer who was once under investigation must provide facts with more than "the sheer volume of accesses" to explain why members of law enforcement would take special interest in his personal information. *McDonough* at 954-55.

**A.     Analysis of the accesses under the DPPA**

Plaintiffs do not specify the locations, time of day, vehicles, or law enforcement agencies involved in the stops that they concede took place.  They also fail to specify whether they were together when these stops occurred or driving separately.  This missing information is key to multiple issues.  First, as the Eighth Circuit observed in its *McDonough* opinion, "there may be occasions where there are permissible purposes to justify" accesses by more than one law enforcement agency at once, such as when they work together on an investigation or in preparation for an event.  *McDonough* at 947.  Here, Moose Lake's jurisdiction falls within Carlton County's geographically.  Carlton County and Pine County border each other.  Bridie works in Pine County, and though their complaint does not specify where they lived at the time of various events and accesses, both Plaintiffs lived in both Counties during the last four years.

Additionally, Plaintiffs do not provide a thorough account of their communications with Sgt. Belich, giving flat summaries of the conversations without specifying if the statements attributed to him are verbatim quotes and neglecting to specify, for example, what precisely they asked, or whether when Sgt. Belich stated that "no one had looked them up" he indicated whether there had been no *improper* accesses or simply no accesses at all.  This is a glaring omission because Plaintiffs concede that Carlton County personnel had valid reasons for accessing their records on some occasions, so it would weigh more heavily in considering Sgt. Belich's credibility if he

had completely denied any accesses occurred.[14]  Plaintiffs do not offer details regarding Bridie's discussions with BCA employees, such as the means by which they communicated and whether the statements attributed to Judy Strobel or Gary Link are verbatim quotes or Bridie's recollections of words to a certain effect.  Plaintiffs do not explain what support BCA staff gave for their contentions, such as how Strobel would know if anyone from Carlton County had inquired about accesses to Plaintiffs' records, or any context for Link's comment that "he had never seen so many lookups."

In their written responses and at oral arguments, Plaintiffs did not argue that Defendants' motions are premature, signaling to the Court that they do not intend to submit additional information through a second amended complaint.  (Doc. No. 36, Strauss Aff., Doc. Nos. 53, 55 ("Oral Arguments")).

As Plaintiffs put it, "[t]his is a small world."  (Doc. No. 36 at 2.)  They point out that the Moose Lake Police Department has only five officers.  (*Id.* at 9.)  Taking their assertions that their personal business is a topic of high interest in the community as true, as the Court must at this stage, shows that Plaintiffs and Defendants are operating in an environment where it would in fact be very difficult for local law enforcement officers to avoid accessing acquaintances in the course of their duties.

---

[14]     Plaintiffs acknowledge the significance of this distinction by way of their statement that "[i]f [Sgt. Belich] and Carlton County took no steps to identify whether there were *inappropriate* accesses of Plaintiffs' information as requested . . . then they lied to Plaintiffs [by] suggesting they had checked in a clear effort to persuade Plaintiffs not to pursue or discover the wrongdoing."  (Am. Compl. ¶ 13 (emphasis added).)  This statement further muddles Plaintiffs' narrative and hinders the Court's analysis by failing to specify whether Sgt. Belich had characterized the accesses in question as "inappropriate."

Plaintiffs try to bat away Defendants' arguments that the existence of various protective orders would provide an obvious alternative explanation for why law enforcement officers needed to access Plaintiffs' data, stating that a "victim trying to enforce an [OFP]" should only receive law enforcement attention when he or she "makes a call to have it enforced." (Doc. No. 36 at 8-9, n. 3.) This argument shows ignorance of practical considerations for law enforcement with respect to OFPs—these are court orders in force at all times, not at the discretion of the protected person, and law enforcement's interest in determining whether or not the person subject to the order is violating it is obvious and self-explanatory. If, as Defendants argue, an officer suspects that someone who presents such a threat to a protected party's safety that a court order is warranted may then be riding in that protected party's vehicle, that officer would absolutely be justified in taking action to confirm the identities of everyone in a vehicle.

In recent years, Plaintiffs' counsel have represented clients in numerous cases involving DPPA claims, often opposed by Defendants' counsel, and often before this Court.[15] Typically, a plaintiff alleges the type of query (name, driver's license number,

---

[15]     Such cases include, among others: *Mallak v. Aitkin Cty.*, 9 F. Supp. 3d 1046 (D. Minn. 2014); *Kampschroer v. Anoka Cty.*, 57 F. Supp. 3d 1124 (D. Minn. 2014), *aff'd*, 840 F.3d 961 (8th Cir. 2016); *Sapp v. City of Brooklyn Park*, Civ. No. 14-4698, 2015 WL 3795613 (D. Minn. June 18, 2015) *appeal dismissed*, 825 F.3d 931 (8th Cir. 2016); *McDonough v. Anoka Cty.*, 799 F.3d 931 (8th Cir. 2015); *Krekelberg v. Anoka Cty.*, Civ. No. 13-3562, 2016 WL 4443156 (D. Minn. Aug. 19, 2016); *Tichich v. City of Bloomington*, 835 F.3d 856 (8th Cir. 2016); *Engebretson v. Aitkin Cty.*, Civ. No. 14-1435, 2016 WL 5400363 (D. Minn. Sept. 26, 2016); *Shambour v. Carver Cty.*, 709 F. App'x 837 (8th Cir. 2017); *Rollins v. City of Albert Lea*, Civ. No. 14-299, 2016 WL 6818940 (D. Minn. Nov. 17, 2016); *Heglund v. Aitkin Cty.*, 871 F.3d 572 (8th Cir. 2017), *cert. denied sub nom. Heglund v. City of Grand Rapids, Mich.*, 138 S. Ct. 749 (2018);

or vehicle tags) in an initial or amended complaint.  *See, e.g., Sapp* at \*2 (alleged accesses by name), *Kost v. Hunt*, 983 F.Supp.2d 1121 (D. Minn. 2013) (accesses by driver's license number), *Mallak v. Aitkin Cty.* at 1058 (accesses by name), *McDonough* at 939 (accesses by name), *Tichich* at 868, 877-79 (accesses by name), *Orduno v. Pietrzak*, 932 F.3d 710, 714 (8th Cir. 2019) (accesses by name), *Kampschroer* at 1134 (accesses by name), *Berenguer* at 481 (accesses by name).  Statements in Plaintiffs' submissions indicate that they have this information.  (Doc. No. 36 at 12, n. 7.)  Plaintiffs chose not to specify the type of query in their allegations and to provide their own summaries of the audit information they consider pertinent, although audits are generally attached to complaints as exhibits.  *See, e.g., Mallak v. Aitkin Cty.* at 1058 (audit attached as exhibit), *McDonough* at 939, *Kampschroer* at 1134, *Tichich* at 875, 878 (same).  Plaintiffs' decision to present a curated set of facts is not convenient for the Court— rather, it has stymied the Court's ability to discern any pattern or suspicious nature in the accesses in question.

Plaintiffs deprive the Court of the full list of accesses yet ask the Court to ignore alternative explanations from Defendants, suggesting that even if "a couple" of the accesses outside the statute of limitations period were in fact related to the issuance of a harassment restraining order against a friend's husband (granted to Bridie on January 31, 2014, an event never mentioned in Plaintiffs' papers (*see* Doc. No. 44-1 at 4)) that the Court should simply "disregard the couple of . . . accesses that the Plaintiffs possibly

---

*Berenguer v. Anoka Cty.*, 889 F.3d 477 (8th Cir. 2018); *Orduno v. Pietrzak*, 932 F.3d 710 (8th Cir. 2019).

mistakenly included without realizing the connection to the [restraining order]."  (Doc.

No. 53 at 13.)  The Court is not willing to comb through the records looking for events

related to accesses in Plaintiffs' summary, or to speculate as to which accesses it may

safely disregard.

Plaintiffs understate the requirements for their pleadings at this stage,

characterizing the standard as "very low" and arguing that under *McDonough* and

*Tichich*, "allegations of either personal connections or suspicious access patterns, along

with a denial that there was any law-enforcement reason for the accesses, makes the

necessary showing of plausibility."  (Doc. No. 53 at 9, 14.)  While it is true that Plaintiffs

are entitled to the assumption that their allegations are true and the construction of

inferences in their favor, this does not mean that asserting claims based on attenuated

relationships *or* patterns that Plaintiffs flatly conclude are suspicious, paired with

unsupported denials of any justification for accesses, is sufficient for a DPPA claim to

move forward.  Plaintiffs overstate the strength of their claims; for example, concluding

that members of law enforcement from Carlton County "regularly" accessed Bridie's data

late at night or early in the morning, then listing four accesses over a span of 19 months,

each separated by several months and two of which took place after 5:30 a.m.  (Doc. No.

53 at 13.)  Plaintiffs also conclude that Karp "essentially admitted" that their personal

connections to Karp and Roberts through Rhonda "likely led to the accesses."  (*Id.* at 15.)

Even couched in qualifying language, this is a leap in reasoning—from Plaintiffs'

account of Karp's statement, there is no reasonable way to conclude that Karp was

admitting to accessing Plaintiffs' data for an impermissible purpose.  There would be no

advantage to be gained in a divorce through a motor vehicle record, which would not contain any information that a spouse would not already have, and there is no logical temporal connection between the accesses and Jason's divorce. The Court declines Plaintiffs' invitation to speculate any further as to the motivations of the various players in their troubled relationships.

Perhaps most importantly, as discussed above, the caselaw in the Eighth District is clear in that obtainments of data by name are significant, and accesses by a license plate query can do little to nothing to bolster a claim of plausibility. *Tichich* at 869. That Plaintiffs choose not provide information about accesses by name, if they have it, but choose instead to deny the significance of such information leaves their claims in a weaker position. Defendants suggested at oral arguments that the fact that Bridie works at a 24-hour business raises the possibility that late-night accesses could easily be justified, if made by vehicle plate number—it follows that Bridie may have been driving at the times in question and drawn the attention of an officer on patrol. (Oral Arguments.) Although Plaintiffs responded that police have less contact with cars at night (*id.*), Defendant's point makes far more sense and can be considered an obvious, lawful, explanation. In fact, vehicle stops could reasonably account for all of the accesses in the summaries. While Plaintiffs' claim that the lights on their vehicle or vehicles (whose vehicle(s) and whether more than one vehicle was stopped, they opted not to explain) were operational, they could draw legitimate law enforcement attention through any number of traffic infractions or due to their various law enforcement contact. Late night traffic patrols, when impaired driving enforcement is heightened, especially on

holidays like New Year's, could easily lead to accesses by plate number or driver's license number that do not implicate any suspicion that police officers are accessing persons' data out of boredom.

Likewise, the small number of accesses that coincide among Defendants' could very well be due to one patrol car calling for assistance, or some other obvious alternative. The Court notes that in this case, even accesses by name could be explained by Plaintiffs' own statements regarding calls made to law enforcement—without precise dates or a full listing, it is impossible to tell.

The total number of accesses, so far as the Court can tell from the summaries, is relatively small in comparison with many other cases where plaintiffs' DPPA claims were found insufficient. Most accesses of Jason's data were made by Carlton County personnel, but it was accessed by many different devices, in no discernible pattern. Accesses of Bridie's data are mostly attributed to Pine County, not Moose Lake, and the Moose Lake accesses are by multiple users, meaning that any connection she has to the police chief sheds no light on the purpose for the accesses.

Most importantly, without the full audits, the Court has no way to sort free-floating, untethered accesses, possibly separated by less time but also possibly closer in time to legitimate contact with law enforcement than the summaries would indicate, into *any* sort of pattern, much less a suspicious one. Plaintiffs' failure to allege sufficient facts appears to be the result of either an irreparable deficiency in their case or a deliberate choice, and not the result of lack of discovery at this stage. Without the

information Plaintiffs' chose to withhold, the Court cannot find any allegations sufficient under the standard first set forth in *McDonough* and elaborated in *Tichich* and *Berenguer*.

## CONCLUSION

The court concludes that the facts, viewed in the light most favorable to the plaintiffs, fail to create a genuine dispute over whether Defendants violated Plaintiffs' statutory rights under the DPPA.

## ORDER

Based upon the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant City of Moose Lake's Motion for Judgment on the Pleadings (Doc. No. [30]) is **GRANTED**.

2.      Defendants Carlton County, Pine County, Bridget Karp, and Randy Roberts' Motion for Judgment on the Pleadings (Doc. No. [41]) is **GRANTED**.

3.      Plaintiffs Bridie Anne Wickstrom and Jason Elmer Wickstrom's claims are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  November 21, 2019                    s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge